___ FILED   ___ ENTERED
___ LOGGED   ___ RECEIVED

11:41 am, Dec 08 2021
AT  BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:** | Case No. _____ **21-3239  ADC** |
| **THE RESIDENCE LOCATED AT 5043 WRIGHT AVENUE, BALTIMORE, MARYLAND 21205 ("TARGET LOCATION #1")** | **Filed Under Seal** |
| **THE BODY OF MICHAEL LEE MCDONALD ("TARGET LOCATION #2")** | **21-3240  ADC** |
| **TOYOTA TUNDRA PICKUP TRUCK BEARING MARYLAND TAG 6DB5198 ("TARGET LOCATION #3")** | **21-3241  ADC** |
| **CHRYSLER PACIFICA MINIVAN BEARING MARYLAND TAG 5EG7122, ("TARGET LOCATION #4").** | **21-3242  ADC** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Sean O'Rourke, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal

Rule of Criminal Procedure 41 in support of:

> a.  An application for a warrant to search the residence located at 5043 Wright
>
> Avenue, Baltimore, Maryland 21205 ("**TARGET LOCATION #1**"), further
>
> identified in Attachment A-1, for items identified in Attachment B-1;
>
> b.  An application for a warrant to search the person of MICHAEL LEE
>
> MCDONALD and to draw and test the blood of MICHAEL LEE

MCDONALD ("**TARGET LOCATION #2**"), further identified in Attachment A-2, for items identified in Attachment B-2;

c.  An application for a warrant to search a Toyota Tundra Pickup Truck registered to MICHAEL LEE MCDONALD and bearing Maryland tag 6DB5198 (**TARGET LOCATION #3**), further identified in Attachment A-3 for items identified in Attachment B-3; and

d.  An application for a warrant to search a Chrysler Pacifica minivan registered to MICHAEL LEE MCDONALD and bearing Maryland tag 5EG7122 (**TARGET LOCATION #4**), further identified in Attachment A-4 for items identified in Attachment B-4.

2.     I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since May 13, 2018.  I attended New Agent training at the FBI Academy in Quantico, Virginia. I am currently assigned to the Joint Terrorism Task Force (JTTF) in the FBI Baltimore Division where my duties include investigating both international and domestic terrorism which typically involve violations of Title 18 of the United States Code. Prior to joining the FBI, I served nine (9) years with the City of Norfolk Police Department in Norfolk, Virginia as a police officer, detective, and Task Force Officer with the FBI Norfolk Division's Violent Crime Task Force. I have prepared multiple search warrant applications, conducted, and participated in physical and electronic surveillance, assisted in the execution of residential and commercial search warrants, debriefed informants and reviewed other pertinent records. Through my training, knowledge, and experience, I have become familiar with the efforts of persons involved in criminal activity to avoid detection by law enforcement. Moreover, as it relates to the violation being investigated, I have participated in federal, state, and local investigations of criminal enterprises engaged in

2

trafficking firearms and illegal controlled substances and their efforts to conceal their finances related to their crimes. During those investigations I participated in controlled purchases of illegal controlled substances and firearms, authored, and executed search and arrest warrants, tasked informants, collaborated with other law enforcement agencies and debriefed users of illegal controlled substances about their experiences to gain further insight into the illegal drug trade.

3.      The facts in this affidavit come from my personal observations, my training and experience, my review of documents, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

4.      This Court has venue and jurisdiction to issue the proposed warrants because this is an investigation of illegal drug and weapons possession and federal tax offenses that have occurred in the District of Maryland, under Federal Rule of Criminal Procedure 41(b)(3), and this Court is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711, because it is a district court of the United States that has jurisdiction over the offenses being investigated. *See* 18 U.S.C. § 2711 (3)(A)(i).

5.      Based on the facts set forth below, I respectfully submit that probable cause exists to believe that the information requested will lead to evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. § 922(g)(3) (Possession of Firearms and Ammunition by an Unlawful User of Controlled Substance), 21 U.S.C. § 844 (Possession of Controlled Substances), 26 U.S.C. § 7201 (Attempt to Evade or Defeat Tax), and 26 U.S.C. § 7203 (Failure to File Income Tax Return) (hereinafter referred to as the "TARGET OFFENSES"), that have been committed, are being committed, or will be committed by MICHAEL LEE MCDONALD. Specifically, Title 18 U.S.C. § 922 (g)(3) provides:

It shall be unlawful for any person ... who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C 802))... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearms or ammunition; or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

Title 21 U.S.C § 844 provides:

It shall be unlawful for any person knowingly or intentionally to possess a controlled substance unless such substance was obtained directly, or pursuant to a valid subscription or order, from a practitioner, while acting in the course of his professional practice, or except as otherwise authorized by this subchapter or subchapter II.

Title 26 U.S.C. § 7201 provides:

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony....

Title 26 U.S.C. § 7203 provides in relevant part:

Any person required under this title to pay any ... tax, or required by this title or by regulations made under authority thereof to make a return... who willfully fails to ... make such return ... at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor ....

6.     As set forth in further detail in this affidavit, I submit that there is probable cause to believe that MCDONALD is a habitual purchaser and user of illegal controlled substances and that he possesses a firearm. I further submit that there is probable cause to believe that MCDONALD communicated with his suppliers of the illegal substances, three of whom regularly filled prescriptions for opioids issued by the same local pain clinic, by text messages prior to the seizure of his cellphones on October 7, 2020, and that he has continued to be in contact with some or all of those suppliers for the same purpose of purchasing unlawful controlled substances for his own use since that time. I also submit that there is probable cause to believe that MCDONALD has

4

engaged and continues to engage in an identifiable pattern of making cash withdrawals from his

bank account at automated teller machines (ATMs) in order to pay for those purchases. Finally, I

submit that there is probable cause to believe that MCDONALD has evaded and failed to pay

federal income taxes for the years 2016 through 2018, and that he has failed to file income tax

returns for the years 2016 through 2019.

## PROBABLE CAUSE

### Relevant Persons and Entities

7.      MICHAEL LEE MCDONALD is a resident of Baltimore, Maryland. From

approximately August 11, 2008, through November 9, 2020, MCDONALD was employed as a

toolmaker at Company A in Baltimore, Maryland.  Since November 25, 2020, he has been

employed as a machinist by Company B, also located in Baltimore, Maryland. MCDONALD's

current work location is at 5501 Holabird Avenue, Baltimore, Maryland.

8.      Person #1 is a resident of Baltimore, Maryland. Based on my review of records

received from credit bureaus and publicly available public records databases, I have determined

that telephone number (443) 866 2143 belongs to Person #1 and that Person #1 lives at 4801

Orville Avenue, Baltimore, Maryland (hereinafter "Person #1's residence").   I have also

determined, based on a preliminary analysis of Medicaid data maintained by the State of Maryland

(hereinafter "State of Maryland records"), that Person #1 received a monthly prescription for 84

units of Oxycodone Hydrochloride and 56 units of Morphine Sulfate, which re opioids, during the

year 2020 into January 2021.[1]  Oxycodone Hydrochloride and Morphine Sulfate, are Schedule II

---

[1] Records received for Persons #1 and #2 received from the state of Maryland covered 2020 into
January of 2021 only.

controlled substances under the Controlled Substances Act (21 U.S.C. § 802).

9.     Person #2 is a resident of Dundalk, Maryland. According to Maryland Motor

Vehicle Administration records and public records databases, telephone number (410) 301-7111

and address of 255 Baltimore Avenue, Dundalk, Maryland (hereinafter "Person #2's residence")

belong to Person #2.  I have also determined, based on a preliminary analysis of the State of

Maryland records, that Person #2 received monthly prescriptions for 180 units of Oxycodone

Hydrochloride from Pain Clinic A during the year 2020 into January 2021.

10.     Person #3 is a resident of Baltimore, Maryland. I have determined, based on

publicly available public records databases and on physical observations made by law enforcement

agents, that telephone number (410) 698 8895 belongs to Person #3 and that Person #3 lives at 50

Ambo Circle, Baltimore, Maryland (hereinafter "Person #3's residence"). I have also determined,

based on a review of records provided by the National Criminal Information Center (NCIC) that

Person #3 was convicted of Possession of Controlled Dangerous Substances  ("CDS") with Intent

to Distribute in Baltimore County Circuit Court on May 18, 2011 (Court Case Number

03K11002375) and Possession of CDS with Intent to Distribute in 2012.[2]

11.     Person #4 is a resident of White Marsh, Maryland.  I have determined, based on

publicly available public records databases and on physical observations made by law enforcement

agents, that telephone number (410) 350 9907 belongs to Person #4 and that Person #4 lives at

11112 Bird River Grove Road, White Marsh, Maryland (hereinafter "Person #4's residence").[3]  I

---

[2] Person #3 was also arrested in 2015 on a charge of Possession of CDS with Intent to Distribute.
That charge was later dismissed by the State of Maryland.

[3] In December of 2020, a public database also listed the address of 4801 Orville Avenue, Baltimore,
Maryland for both Person #1 and Person #4.

have also determined, based on a preliminary analysis of the State of Maryland records, that Person #4 receives monthly prescriptions for 30 units of Clonazepam from Pain Clinic A.[4]  Clonazepam is a benzodiazepine and a Schedule IV controlled substance under the Controlled Substances Act (21 U.S.C. § 802).

12.     Pain Clinic A is a pain management center located in Baltimore. The clinic issues prescriptions for a variety of medications used to mitigate pain; some of which are controlled substances scheduled by the Controlled Substances Act (21 U.S.C. § 802).

**Previous Relevant Search Warrants and Orders Issued in the District of Maryland**

13.     On October 7, 2020, United States Magistrate Judge Thomas M. DiGirolamo issued search warrants for MCDONALD's residence and his person in connection with an investigation into other potential offenses. *See* Misc. Nos. 20-2559-TMD and 20-2560-TMD.  During the execution of those search warrants on October 7, 2020, law enforcement agents located and seized 14 firearms and multiple electronic devices, including two cellular telephones (hereinafter "Cellphone-1" and "Cellphone-2").

14.     On December 4, 2020, United States Magistrate Judge DiGirolamo issued search warrants to Sprint Corporation, the telecommunications provider for telephone number 443-801-9749, which was a new cellular telephone belonging to MCDONALD ("Cellphone-3"). The warrants sought E-911/GPS data as well for historical and prospective cell-site data from December 4, 2020, through January 3, 2021. *See* Misc. Nos. 20-3042 through 3043-TMD.

15.     On January 6, 2021, United States Magistrate Judge, J. Mark Coulson issued a

---

[4] The records requested for Person #4, which were received more recently than the records for Persons #1 and #2, indicated that Person #4 received a monthly prescription for Clonazepam on September 10, 2021.

renewal of the Pen Register/Trap and Trace Order that had been issued for Cellphone-3 on

November 2, 2020. *See* Misc. No. 21-13.

16.     On August 16, 2021, United States District Judge Deborah L. Boardman issued a

Pen Register/Trap and Trace for cellular telephone number (443) 804 0759 ("Cellphone-4"), which

is the most recent telephone number associated with MCDONALD. *See* Misc. No. -21-503. This

was the third known telephone number used by MCDONALD since October of 2020.

### MCDONALD's Bank Account

17.     According to records obtained from Lockheed Martin Federal Credit Union,

MCDONALD has had an account ending in 17305 ("MCDONALD'S account") from at least

January 1, 2016, through September 30, 2021.

18.     MCDONALD's bank account records reflect that Company A deposited

approximately $900.00 to 1,500.00 every two weeks into his account between January 1, 2016, and

November 12, 2020[5]. Company B deposited $1,600.00 to $2,200.00 every two weeks into the

account beginning November 25, 2020, through September 2021. Based on the regularity and the

consistent amounts of those deposits, I believe that those deposits are McDonald's wage payments.

### Contents of Cellular Telephone-1 and Cellular Telephone-2

19.     Initial analysis of the contents of Cellphone-1 and Cellphone-2, which were seized

on October 7, 2020, pursuant to the search warrants referenced in paragraph 13 above, revealed

that the telephone numbers associated with Person #1, Person #2 and Person #3 were included in

the "contacts" list in both Cellphone-1 and Cellphone-2. Person #4's telephone number was not

---

[5] I have found through my investigation, and from speaking with representatives of Company A, that the fluctuations in MCDONALD's pay were the result of pay increases as well as overtime hours worked.

found in the contacts list recovered from either Cellphone-1 or Cellphone-2, but was later observed in the pen register data, as further explained in this affidavit.

20.     Initial analysis of Cellphone-1 and Cellphone-2 revealed numerous and frequent text message conversations between MCDONALD, Person #1, Person #2, Person #3 and others regarding purchases of illegal controlled substances between November 2019 and October 2020. Included in those texts were  multiple references to the terms, "*5's, 10's, 15's, 30's, pinks, greens and subs*." Based on my training, experience, and communications with other experienced law enforcement officers, I understand that  "*5's,10s, 15's, 30's, pinks and greens*" are references to opioids such as Oxycodone Hydrochloride and Morphine Sulfate, which are Schedule II controlled substances under the Controlled Substances Act (21 U.S.C. § 802), and are generally partitioned in 5, 10, 15 and 30 milligram doses. Additionally, I understand that "subs" is a commonly used reference to Suboxone, a synthetic opioid that is used to treat heroin addiction and is a Schedule III controlled substance under the Controlled Substances Act (21 U.S.C. § 802).

21.     Based on my training, knowledge and experience, and the training, knowledge and experience of law enforcement agents assigned to this investigation, I know that the street-level price of those controlled substances is approximately $8.00 to $10.00 per pill depending on the potency and quality. Because users frequently consume illegal controlled substances at rates higher than prescribed to achieve a desired effect, they generally purchase the illegal substances in bulk amounts.

22.     I have compared the timing and content of the various text messages on Cellphone-1 and Cellphone-2 with the activity reflected in MCDONALD's bank account records. As set forth in detail below, that comparison established that MCDONALD often arranged by text to purchase the illegal substances from either Person #1, 2 or 3 and then, within a short time before or after making those arrangements, there was a cash withdrawal or withdrawals from his bank account at an

9

Automated Teller Machine ("ATM"). The withdrawals were often in amounts of $100 and $200, and when there was more than one withdrawal, they usually occurred at the same ATM within one minute of each other.

23. Additionally, I know based on my review of the conversations between MCDONALD and Person #2 outlined in the paragraphs below, that MCDONALD generally sought to purchase thirty (30) pills from Person #2 at a time. Based on that knowledge and the knowledge that pills of Oxycodone and Morphine Sulfate usually cost between $8.00 and $10.00 per pill for individual sale, I believe that MCDONALD generally made withdrawals of $100.00 to $300.00 for the purpose of purchasing pills from either Person #1 or Person #2.

**MCDONALD's Drug Related Text Messages with Person #2 and the ATM Withdrawals Between November 2019 and June 2020.**

24. On November 8, 2019, at 12:51PM, the following text message conversation took place:

> MCDONALD: *"Hey u still have subs[6]"*
> PERSON #2: *"Yeah I have 6 left."*
> MCDONALD: *"What are they mg wise n how much"*
> MCDONALD: *"Im gonna grab all 6 for my buddy just need to tell him how much loot to have for me"*
> PERSON #2: *"They r 8 a piece I'm at work but I can let my mom know"*
> MCDONALD: *"OK cool ill be over that way I gotta pick my daughter up after work"*
> MCDONALD: *"Are they 8mg or 12 mg?"*
> PERSON #2: *"Ok"*
> PERSON #2: *"8"*
> MCDONALD: *"Ok... thanks jan and ill stop over lilbit after 3"*

25. Forty-seven minutes earlier, on November 8, 2019, at 12:04 PM, there was a cash withdrawal in the amount of $150.00 from MCDONALD's account at an ATM located at 101

---

[6] Based on my training and experience, I believe that "subs" is a reference to Suboxone as referenced above in paragraph 20.

Chesapeake Park Plaza, Middle River, Maryland (the "Chesapeake Park ATM").[7] That ATM is

closely located to MCDONALD's then-employer, Company A.

26.     On December 11, 2019, at 9:37AM, the following text message conversation took

place:

> PERSON #2: *"My mom will have some extra pinks today"*
> MCDONALD: *"Ok ill let u know idk if I have the funds this week"*

27.     Approximately five and a half hours later that day, there was an ATM withdrawal at

3:08 PM in the amount of $30.00 from MCDONALD's account, which left a negative balance of -

$28.59.

28.     On December 17, 2019, at 4:14PM, the following text message took place:

> PERSON #2: *"Its ok I had just got some 15s but ill hit yall tomorrow tho"*
> MCDONALD: *"Yea wife gotta work tonight so i wanted to grab her some so she good for work and they were there so I grabbed them i rather pinks tho"*
> PERSON #2: *"Just let me no how many to hold"*
> MCDONALD: *"Will do in the morning when I see my check posted"*
> PERSON #2: *"Gotcha"*

29.     Two days later, on December 19, 2019, the bi-weekly payment from Company A

was posted in MCDONALD's account. Also, on December 19, 2019, two cash withdrawals were

made from an ATM located at 4700 Erdman Avenue (the "Erdman Avenue ATM"), the first in the

amount of $200.00 at 7:03PM and the second in the amount of $100.00 at 7:04PM. Based on my

review of MCDONALD's bank account records and my training and experience, I submit that it is

reasonable to conclude that MCDONALD's reference to seeing "my check posted" in the text

message above was a reference to this wage payment and that he withdrew cash from the ATM to

---

[7] The references to the time of withdrawal are taken from the bank account records. Beginning in May of 2021, however, Lockheed Martin Federal Credit Union stopped including the times of transactions in those records.

purchase the "15s" referenced by Person #2 after the funds were posted in his account that same day.

30.     On January 27, 2020, at 1:59PM, the following text message conversation took place:

> MCDONALD: *"Any Pinks?"*
> PERSON #2: *"No sorry"*
> MCDONALD: *"ok"*

31.     On January 28, 2020, at 2:41PM, the following text message conversation took

place:

> MCDONALD: *"When are pinks gonna be around?"*
> PERSON #2: *"The 5th"*
> MCDONALD: *"Ok sweet we leave the 6th so that's perfecto it be more but as of now 50 lol. I wanna be nice on my trip lol"*
> PERSON #2: *"OK gotcha"*

32.     Eight days later, on February 5, 2020 at 6:59PM, a cash withdrawal was made from

MCDONALD's account at an ATM which is located in Royal Farms store at 18 South Dundalk

Avenue, Baltimore, Maryland ("the Dundalk Avenue ATM").   This ATM is located less than a mile

from the residence of Person #2.

33.     On February 11, 2020, at 7:45PM, the following text message conversation took place:

> MCDONALD: *"Will I be able to grab a bunch tomorrow?"*
> PERSON #2: *"How many I have to let my sister jo"*

34.     Two days later, on February 12, 2020, two cash withdrawals were made from

MCDONALD's account at the Dundalk Avenue ATM.  The first withdrawal, in the amount of

$200.00, occurred at 6:38 PM, and the second withdrawal in the amount of $100.00 occurred at 6:40

PM.

35.     On March 3, 2020, at 5:28PM, the following text message conversation took place:

> MCDONALD: *"U get my text about 60?"*
> PERSON #2: *"yeah"*
> PERSON #2: *"Awesome..i appreciate ya so much!!"*

36.  On March 4, 2020, at 3:33PM, the following text message conversation took place:

   MCDONALD: *"Ill be over at 7 when I get paid"*
   PERSON #2: *"OK she don't got them yet but she will"*
   MCDONALD: *"Ok cool"*

37.  At 6:52PM on March 4, 2020, the following text message conversation took place:

   MCDONALD: *"Whsts up jan. can I swing by in A few"*
   PERSON #2: *"Yeah"*
   MCDONALD: *"K see ya in a few"*

38.  Approximately 13 minutes later, on March 4, 2020, two cash withdrawals were made from MCDONALD's account at the Dundalk Avenue ATM. The first withdrawal, in the amount of $200.00, occurred at 7:05 PM, and the second withdrawal in the amount of $100.00 occurred one minute later.

39.  On March 5, 2020, at 12:18PM, the following text message conversation took place

   PERSON #2: *"No u got the last that she had"*
   MCDONALD: *"Ok all good was just thinking of extras incase lol. Ill be by after work to pay her the rest"*
   PERSON #2: *"Ok"*

The following day, there were multiple withdrawals in varying amounts ranging from $50.00 to $275.00 from MCDONALD's bank account.

40.  On March 18, 2020, at 8:28AM, the following text message conversation took place:

   MCDONALD: *"Happy pinks day"*
   PERSON #2: *"Lol lets hope"*
   MCDONALD: *"Yea no doubt...lmk"*
   PERSON #2: *"I will"*
   PERSON #2: *"How many would u need"*
   PERSON #2: *"I go to the doctors soon"*
   MCDONALD: *"30"*

41.  According to the State of Maryland records, a medical provider associated with Pain Clinic A issued a prescription for Oxycodone Hydrochloride to Person #2 on March 18, 2020.

42.     Also on March 18, 2020, the following text message conversation took place at 2:08PM:

> MCDONALD: *"U home"*
> PERSON #2: *"Yeah"*
> MCDONALD: *"Can I get more"*

43.     Five hours and 18 minutes after that conversation, there were two cash withdrawals from MCDONALD's bank account at the Dundalk Avenue ATM. The first withdrawal, in the amount of $200.00, occurred at 7:22 PM, and the second, in the amount of $100.00, occurred one minute later.

44.     On April 22, 2020, at 12:18PM, MCDONALD sent the following text message to PERSON #2:

> MCDONALD: *"Any pinks"*

45.     On April 27, 2020, at 10:56 PM, which was a Monday, the following text message conversation took place:

> MCDONALD: *"Dont forget about me lol"*
> PERSON #2: *"I didn't she cant get them filled until Friday"*

46.     The following Friday, May 1, 2020, at 10:51AM, the following text message conversation took place:

> MCDONALD: *"Lmk if that happens"*
> PERSON #2: *"I'm going to get them soon"*
> MCDONALD: *"Ok im at work but get off at 230"*

47.     Four hours and eight minutes after that conversation, there were two cash withdrawals from MCDONALD's bank account at the Dundalk Avenue ATM. The first withdrawal, in the amount of $310.00, occurred at 2:59 PM, and the second, in the amount of $40.00, occurred immediately after.

48.     On May 6, 2020, at 10:19AM, the following text message conversation took place:

MCDONALD: *"Ok I will... Hey u think your sister will be ok with me paying half tonight half tomorrow?"*
PERSON #2: *"ill ask her she doesn't go until 345 today"*
MCDONALD: *"Ok"*
MCDONALD: *"Does that mean she may not get them filled today?"*
PERSON #2: *"They should be done by 7 before the pharmacy closes"*
MCDONALD: *"Gotcha"*

49.   On May 6, 2020, at 8:05PM, the following text message conversation took place:

PERSON #2: *"I'll ask to see if she has any left"*
MCDONALD: *"Okay"*

50.   On May 21, 2020, at 6:37PM, the following text message conversation took place:

MCDONALD: *"Hey yall have any subs?"*
PERSON #2: *"No we haven't had them in a long time"*
MCDONALD: *"All good I just found some but thanks tho"*
PERSON #2: *"Ok cool"*

51.   On May 29, 2020, at 8:34AM, the following text message conversation took place:

MCDONALD: *"Lmk about that..ill take a bunch"*
PERSON #2: *"How many of she gets them"*
MCDONALD: *"Hold tight gotta ask the wife"*
PERSON #2: *"Ok"*
MCDONALD: *"She aint answering ..so ill just say 50 lol"*
PERSON #2: *"Ok I'll let no"*
MCDONALD: *"K thanks"*
PERSON #2: *"Welcome"*
MCDONALD: *"Any word yet"*
PERSON #2: *"Yes we're good"*
MCDONALD: *"Ok cool ill be over"*
PERSON #2: *"You said 50"*
MCDONALD: *"Yes ma'am"*
PERSON #2: *"Ok"*
MCDONALD: *"Yep"*

52.   Three hours and 26 minutes later, at 12:10PM on May 29, 2020, there was a $500.00 cash withdrawal from MCDONALD's account at an ATM located at 101 Park Plaza, Baltimore, Maryland (the "Park Plaza ATM"). This ATM is located within walking distance of Company A.

53.    On June 2, 2020, the following text message conversation took place:

> MCDONALD: *"Yall come across anything lmk lol"*
> PERSON #2: *"I'll let u no"*
> MCDONALD: *"Would be great lol"*

54.    On June 3, 2020, at 2:48PM, the following text message conversation took place:

> PERSON #2: *"Hey"*
> MCDONALD: *"Hey wuts up"*
> PERSON #2: *"We have 13 available"*
> MCDONALD: *"Ok... ill take them"*
> PERSON #2: *"Ok"*
> MCDONALD: *"Anyways I can come get them n pay at 7"*
> PERSON #2: *"Yes"*
> MCDONALD: *"Cool"*
> MCDONALD: *"Omw"*
> PERSON #2: *"OK"*

55.    At 7:09PM, three hours and 21 minutes later, there was a cash withdrawal of $140.00 from MCDONALD's account at the Dundalk Avenue ATM.

56.    On June 8, 2020, at 2:36PM, which was a Monday, the following text message conversation took place:

> MCDONALD: *"If anything comes up lmk ☺"*
> PERSON #2: *"I will but I go wed"*
> MCDONALD: *"Ok cool Lmk"*

Based on my training and experience, as well as the context of this text message, I believe that the term "wed" as used by Person #2 means "Wednesday. "

57.    On June 10, 2020, which was the following Wednesday, at 10:51AM, the following text message conversation took place:

> PERSON #2: *"Hay"*
> MCDONALD: *"Ok cool just checkin in lol"*
> MCDONALD: *"Make it 50 jan. But can I give you 300"*
> PERSON #2: *"My mom has them"*
> MCDONALD: *"Cool"*
> MCDONALD: *"Omw now 5mins"*

16

MCDONALD: *"ok"*

58.     Six hours and 15 minutes later, there were two cash withdrawals out of MCDONALD's account from the Dundalk Avenue ATM. The first withdrawal of $200.00 occurred at 7:06PM. The second withdrawal at 7:07PM was in the amount of $100.00.

59.     Based on my training, knowledge and experience, I believe that in this instance, Person #2 supplied MCDONALD with the controlled substance on the promise that MCDONALD would pay Person #2 later. I also believe that MCDONALD's reference to "300" in the text conversation is a reference to the $300.00 later withdrawn from the ATM. The practice of providing a quantity of illegal controlled substances "up front" and prior to payment is commonly known as "fronting" and occurs when there has been an established pattern of payment from the customer over time.

60.     On June 11, 2020, at 11:15AM, the following text message conversation took place:

> MCDONALD: *"U have anymore?"*
> PERSON #2: *"No"*
> MCDONALD: *"Okay"*

61.     On June 29, 2020, at 12:39PM, the following text message conversation took place:

> PERSON #2: *"Let me no ahead of time if you will need any"*
> MCDONALD: *"Ok I will"*
> MCDONALD: *"30"*
> PERSON #2: *"Ok"*

**MCDONALD's Drug Related Text Messages with Person #1 and ATM Withdrawals Between February 2020 and October 2020.**

62.     On February 10, 2020, at 5:28PM, the following text message took place:

> MCDONALD: *"Hey this is mike do you have any 15's for sale?"*

63.     On February 17, 2020, at 2:53PM, the following text message took place:

> MCDONALD: *"Any 15s?"*

64.     On February 17, 2020, which was a Monday, at 9:23PM, the following text message took place:

> PERSON #1: *"Just hit me up Wed... I'll still have some 4 ya."*
> MCDONALD: *"Ok awesome thanks so much"*
> PERSON #1: *"If I don't answer then u can always call just in case there's a delay again. Sorry."*

65.     On February 26, 2020, at 11:43AM, the following text message conversation took place:

> PERSON #1: *"I've got greens. Av7."*
> PERSON #1: *"I'll have all 18 put aside for u tomorrow if u still want that many. I'll text u once I'm back."*
> MCDONALD: *"Ok let me knoe"*
> PERSON #1: *"If u give me a heads up I can just save them & only deal with u. I'm in no rush to unload them so they're yours whenever you're ready. Starting tomorrow that is."*
> MCDONALD: *"Ok cool hit me up when u get them."*

66.     On March 5, 2020, at 8:08AM, the following text message took place:

> MCDONALD: *"Hey im gonna swing by after work n get you that money. Is there any 15s left?"*

67.     On March 13, 2020, at 11:58AM, the following text message conversation took place:

> PERSON #1: *"Hey the pharmacy won't have my greens until Monday. I have five of those blue ones if you want them."*
> MCDONALD: *"Ok... yea ill grab them when I get home around 3 oclock."*

68.     On the same day, at 3:05PM, there was a cash withdrawal in the amount of $20.00 from the Erdman Avenue ATM. That ATM is located less than a mile from Person #1's residence and is within walking distance of MCDONALD's residence.

69.     On March 14, 2020, at 7:47PM, the following text message conversation took place:

> PERSON #1: *"I'm picking up the Rx of blues tomorrow around noon. Want any? Greens on Mon around 3 o'clock."*
> MCDONALD: *"Yea ill grab some of them just hit me up when u get home and ill get some."*
> PERSON #1: *"Around"*

18

MCDONALD: *"Ill be home round 2..but what target u going 2..the 1 o martin blvd?"*
PERSON #1: *"No I go to the 1 on Cambell blvd in White Marsh by thr Lowe's"*
PERSON #1: *"it's not far from Martin Blvd. Did u want me to meet u somewhere after I get them?"*
MCDONALD: *"Oh ok was gonna say I could meet ya...I work at middle river aircraft systems next to martin state airport."*

70. The following day, on March 15, 2020, at 1:00PM, there was a withdrawal in the amount of $100.00 from MCDONALD's account at the Chesapeake Park ATM. The State of Maryland records reflect that Person #1 was issued a prescription for Morphine Sulfate on March 14, 2020, and a prescription for Oxycodone Hydrochloride on March 16, 2020.

71. On March 20, 2020, at 5:21PM, the following text message conversation took place:

PERSON #1: *"Hey I've got those other 6 u wanted."*
MCDONALD: *"Im good thanks tho I appreciate it."*

72. On March 30, 2020, at 12:28PM, the following text message conversation took place:

MCDONALD: *"U don't have anything do ya"*
PERSON #1: *"Tomorrow I will by noon. Did you want me to hold you some because I've already got bunch of people calling me about them and I'll have 35 till the 10th."*
MCDONALD: *"I won't have any money till wed."*
PERSON #1: *"Are u sure?? Lol. U mean Wed ngt or when u get off work?"*
MCDONALD: *"Wed evening when my check goes in."*
PERSON #1: *"I'm asking cuz I had my mom and nephew coming to stay for a couple days so I need to get some more food. I don't mind doing it till Wednesday"*
PERSON #1: *"How many"*
MCDONALD: *"Ok.. well ill take 10and will Definitely have your money wed night 100%"*
MCDONALD: *"Make it 12"*

73. On April 2, 2020, which was the following Wednesday, Company A deposited $1,435.86 into MCDONALD's account. At 7:37PM that same day, there was a cash withdrawal in the amount of $120.00 at the Erdman Avenue ATM. Based on my training, knowledge and experience, I believe that, based on previous transactions in which pills were sold for $10.00 each, and the

19

aforementioned amount of "12," that the $120.00 withdrawn on that date corresponded with the

conversation above in which MCDONALD promised Person #1 that he would pay for the 12 pills

after his "check" arrived.

74.　　On April 14, 2020, at 3:13PM, the following text message conversation took place

> MCDONALD: *"ill get a bunch too lol..if possible would u be able t"*
> PERSON #1: *"I should be able to do that 4 u. Not a problem"*
> MCDONALD: *"Cool thanks"*

75.　　On April 15, 2020, at 8:45AM, the following text message conversation took place:

> MCDONALD: *"Are u going to target or Westminster to get them?"*
> PERSON #1: *"Target in White Marsh"*
> PERSON #1: *"I'm calling now 2 see if the delivery truck came in with them yet, It's usually not there until 1:30-2:00 but we could get lucky this time… lol."*
> MCDONALD: *"Ok lol.. just checking in so I know when to keep eye on my phone its hard to hear it in here"*
> MCDONALD: *"I just left the atm"*

76.　　Later that day, there were two withdrawals from MCDONALD's account at the

Erdman Avenue ATM.  The first withdrawal was in the amount of $200.00 at 7:09PM, and the

second, at 7:10PM, was in the amount of $100.00.

77.　　On April 16, 2020, at 11:12PM, the following text message conversation took place:

> PERSON #1: *"Hey I'm sorry I didn't answer earlier. I still have like 15 on me if u want them before u go to work. I've been nursing a migraine so I was in bed all day"*
> MCDONALD: *"Yea can I come get them now and pay u later"*
> MCDONALD: *"I cant get money out until tomorrow…well later today"*

78.　　Also, on April 16, 2020, MCDONALD's account received a direct deposit in the

amount of $1,246.93 from Company A. The next day at 2:01PM, there was a withdrawal in the

amount of $110.00 from the account at the Chesapeake Park ATM.

79.　　On April 23, 2020, at 5:00PM, the following text message conversation took place:

> PERSON #1: *"Hey just wanted 2 let u know I found some 10's… Thanks 4*

*trying 2 help."*
MCDONALD: *"Oh ok cool glad u did I couldn't lol"*
PERSON #1: *"I was gonna get u sone but they only had 5 available"*
MCDONALD: *"its cool I appreciate it...someone I know gets his tomorrow"*

80.   On April 25, 2020, at 12:33PM, the following text message conversation took place:

PERSON #1: *"Hey do u know Anyone that has anything?"*
MCDONALD: *"Sorry was sleeping.. no I don't know of any"*

81.   On May 1, 2020, at 11:05AM, the following text message conversation took place:

PERSON #1: *"What time u think you'll be by?"*
MCDONALD: *"Around 330"*
PERSON #1: *"Perfect"*
PERSON #1: *"I've got 2 greens left. Did u want them? Until next week that is"*
MCDONALD: *"Ill have to see my money situation"*
PERSON #1: *"OK. I understand"*

82.   On May 5, 2020, at 10:15AM, which was a Tuesday, the following text message

conversation took place:

MCDONALD: *"Lmk when u get them ☺"*
MCDONALD: *"Is it going down today my friend?"*
PERSON #1: *"No sweetie. I go Fri morning. Sorry"*
MCDONALD: *"Damn"*

83.   The following Friday, May 8, 2020, the following text message conversation took

place at 10:27AM:

PERSON #1: *"I've hot the goods. Did u need me to Come by your work?? Delivery Service... Yay"*
MCDONALD: *"Lol yea if u want.. I just cant come out til 12"*
PERSON #1: *"I'm next to your truck. The Tundra right?"*

84.   That same day, at 12:01PM, there was a cash withdrawal in the amount of $40.00 from

MCDONALD's account at the Chesapeake Park ATM. Also, on that day, according to the State of

Maryland records, Person #1 received a prescription for Morphine Sulfate.

85.   On May 14, 2020, at 7:59PM, the following text message conversation took place:

PERSON #1: *"I'm almost Home & have some there I can spare"*

21

> PERSON #1: *"I was at Ollies"*
> MCDONALD: *"Ok cool"*
> MCDONALD: *"Lmk if your home n ill come down... I appreciate this a ton"*
> PERSON #1: *"I'm home. Just pulled up"*
> MCDONALD: *"Ok cool"*

86.     Also, on May 14, 2020, MCDONALD's account received a direct deposit from

Company A in the amount of $1,183.05. One hour and 44 minutes later, at 6:15PM, there was a

withdrawal in the amount of $450.00 from MCDONALD's account at the Erdman Avenue ATM.

87.     On May 19, 2020, at 12:38PM, the following text message conversation took place:

> PERSON #1: *"Next Tues is when she goes. This is c"*
> MCDONALD: *"I don't have any money til tomorrow but I can have my wife drop it off during the day?"*
> PERSON #1: *"That's fine. Tomorrow is actually whsn I need it Anyways so I can do that"*
> MCDONALD: *"Ok thanks u bunches.. I be by after work"*
> PERSON #1: *"Or when u get off work is fine"*
> MCDONALD: *"ok.. Ill be by round 245 today after work"*
> PERSON #1: *"U got it. I held onto these all wknd in case u needed em so it worked out."*

88.     On May 20, 2020, at 2:49PM, the following text message conversation took place:

> PERSON #1: *"Hey what time are you coning by"*
> MCDONALD: *"Im waiting for my wife to get home didn't know she was working today. I have 40 on me now I can give u til then"*
> PERSON #1: *"Ok"*
> PERSON #1: *"What time does she get home"*
> PERSON #1: *"U can bring it all by later together if that works"*
> MCDONALD: *"Idk cant get hold of her and her charger is here im thinking her phones dead"*
> MCDONALD: *"Ok cool ill text u before I come by"*
> PERSON #1: *"You'll still br able to drop it of tonight though right cuz I really need it tonight"*
> MCDONALD: *"Yup yup for sure do not worry"*
> PERSON #1: *"Ok great. Thanks"*
> MCDONALD: *"No problem"*

89.     On May 21, 2020, at 5:48PM, the following text message conversation took place:

> MCDONALD: *"U still have subs"*
> PERSON #1: *"I do"*

> MCDONALD: *"Ok ill grab 2 from ya"*
> PERSON #1: *"Hang on I've gotta remember where I put them ...lol"*
> PERSON #1: *"I got em... Sorry"*

90.     Fifty-five minutes later, at 6:43PM, MCDONALD responded with the following:

> MCDONALD: *"Omw"*

I believe that "omw" is shorthand for "on my way."

91.     Forty-three minutes later, at 7:26PM, a withdrawal of $20.00 was made from MCDONALD's account from the Erdman Avenue ATM. As indicated in paragraph 20, I believe that "subs" is a reference to Suboxone, a Schedule III controlled substance and a synthetic opioid used to treat heroin addiction by providing the same desired effects of heroin in a lesser and safer form. Suboxone is most commonly found in the form of strips or tablets taken orally. Furthermore, based on my training, knowledge and experience, I know that the price per tablet for the illicit sale of suboxone is generally in the amount of $10.00 to $80.00 per strip or tablet, based on the potency. Based on the foregoing, I believe that on that day, MCDONALD bought two suboxone tablets or strips from Person #1 for $20.00.

92.     On May 23, 2020, at 7:59PM, the following text message conversation took place

> MCDONALD: *"U still have subs left? My buddy is looking for some"*
> PERSON #1: *"I'm sitting on the front porch if u wanna stop by & get a couple. H"*
> MCDONALD: *"K"*

93.     On May 24, 2020, at 7:10PM, the following text message conversation took place:

> MCDONALD: *"Yea im sorry G the mfkr wouldn't answer back so I just didn't hit u up incase u had someone else for them. Smh... like I said I hate that shit but if it were the other things he would be nonstop hitting me up."*
> MCDONALD: *"I ask other people if they need any and if so ill let u know n come and get them"*

94.     Based on my training, knowledge and experience, and my knowledge of the facts of this investigation, I believe that in the above text conversation, MCDONALD was asking to purchase

Suboxone from Person #1 for another individual.

95.     On May 26, 2020, at 12:04PM, there was a withdrawal in the amount of $300.00 from

MCDONALD's account at the Chesapeake Park ATM.  Later that day, at 3:56PM, the following text

message conversation took place:

> PERSON #1: *"Yes"*
> PERSON #1: *"Sorry I'm running late cuz I had to wait 4 them to get home
> from my moms Drs. Appt. I'm I'd say by 7 I'll be back with them & that's the
> latest cuz I should be back sooner. Hope that's ok"*
> MCDONALD: *"Yup all good hit me up when u get home sista its all good"*
> PERSON #1: *"I'll let I know &send a photo once I have them in my hand"*
> MCDONALD: *"All good...was just wondering but no matter I still want them"*

96.     Several hours later, at 7:18PM, the following text message conversation took place:

> PERSON #1: *"I'm about to head back with them. Had to wait 4 them to get
> back"*
> PERSON #1: *"Sorry"*
> MCDONALD: *"No worries sista.. im one of those type that gotta plan
> everything and know. Whata going on lol"*

97.     On May 28, 2020, at 4:42PM, the following text message conversation took place:

> MCDONALD: *"U home?"*
> PERSON #1: *"Yes"*
> MCDONALD: *"Ok..wife just got home so ill be down in a few"*
> PERSON #1: *"Sounds good"*

98.     On June 2, 2020, at 11:53AM, which was a Thursday, the following text message took

place:

> PERSON #1: *"No sweetie I go Friday... Lol Sorry"*
> PERSON #1: *"I'm sorry. I thought u knew that. I was gonna msg u tomorrow
> & remind u 2"*
> MCDONALD: *"Ok all good"*

99.     On June 4, 2020, at 5:38PM, the following text message took place:

> MCDONALD: *"Wife said text G now so she gets her ass in gear for tomorrow
> lmfao"*
> MCDONALD: *"She already gave me her money n all lol"*

> PERSON #1: *"Lol...All is good 4 tomorrow. My appt is at 10am"*
> PERSON #1: *"Already set up with the pharmacy 2 so they'll have it in stock. We're good 2 go"*
> PERSON #1: *"Sorry I pocket dialed u"*
> MCDONALD: *"Awesome sounds good if u can swing by my job? Ill hit you up tomorrow...thanks"*
> PERSON #1: *"I'll come by your work. I'm at my appt now. Rob almost made me miss it. I'll explain later."*
> PERSON #1: *"I'll let u know when I'm at CVS & about to leave"*
> MCDONALD: *"Ok cool thanks. Crack that mfkr with a pipe"*
> PERSON #1: *"I'm done...Can I swing by"*
> MCDONALD: *"I'm here"*
> PERSON #1: *"Omw"*

I believe that MCDONALD's reference to "G" means Person #1, whose first name begins with "G."

100.    The next day, June 5, 2020, at 2:33PM, there were two withdrawals from MCDONALD's account at Chesapeake Park ATM. The first withdrawal was in the amount of $300.00 and the second withdrawal in the amount of $120.00.

101.    On June 6, 2020, at 2:46PM, the following text message took place:

> MCDONALD: *"U have any greens left"*
> PERSON #1: *"Yes let me count how many"*
> PERSON #1: *"7"*
> PERSON #1: *"And a bunch of blues... I may need to buy a tire anyways. Robs at B"*
> PERSON #1: *"Did u want em?"*
> PERSON #1: *"I'm sorry I don't see your msg until now. Did u still want these??"*
> MCDONALD: *"Yea im gonna swing by"*

102.    Two hours and 50 minutes later, at 5:36PM, there was a withdrawal in the amount of $80.00 from MCDONALD's account at the Erdman Avenue ATM. Based on my training, knowledge, and experience, I believe that the amount of $80.00 is consistent with the illicit purchase of 7 "Greens," which I believe to be Morphine Sulfate, at a price of $10.00 to $12.00 per pill.

103.    On June 15, 2020, at 1:55PM, the following text message conversation took place:

MCDONALD: *"14"*
PERSON #1: *"Okay"*
MCDONALD: *"Okay"*
PERSON #1: *"I'll update u a-z soon as she gives me the on"*
MCDONALD: *"Ok"*
MCDONALD: *"Hey do u mean I can get them today n pay tomorrow?"*
PERSON #1: *"Yes I'm getting them now"*
MCDONALD: *"You are fucking awesome.. thank u so much"*
PERSON #1: *"I just have to swing by Home Depot real quick and then I'll be home. I'll text you when I'm leaving there"*
MCDONALD: *"Ok No problem no rush"*
PERSON #1: *"On my way home"*
MCDONALD: *"Ok cool..im cooking the dogs their eggs for dinner. So by the time im done u will prolly be home...so ill head down once im done cooking them their dinner"*

104.   On June 16, 2020, at 11:16AM, the following text message took place:

PERSON #1: *"Hey am I suppose to Cone by your work to pick that up?? What time do u think you'll have it cuz she asked what Time I was coming by that's why I'm askin"*
PERSON #1: *"g...Sorry"*
MCDONALD: *"No I don't have it..soon as my wife gets home ill bring it to ya. Ill hit her now and get the time"*
MCDONALD: *"Around 4ish"*
PERSON #1: *"Ok"*
MCDONALD: *"Anyway u can get more? Lol"*
PERSON #1: *"Yes"*
MCDONALD: *"Cool"*
PERSON #1: *"I think there's like 20 left"*
PERSON #1: *"I arranged that last week for us remember"*
MCDONALD: *"Ok sweet"*
PERSON #1: *"I knew we'd end up needing/wanting them so I had her hold 40"*
MCDONALD: *"Lol rite...good plan"*
PERSON #1: *"Shes on her way home now"*
MCDONALD: *"Is she gonna front u the other 20?"*
PERSON #1: *"I don't know. I know she needed to pay some bills today"*
PERSON #1: *"Cause I'd have to run the money back down to her again tomorrow. I won't know till I get there"*
MCDONALD: *"Ok im gonna get wife to grab all the money"*
PERSON #1: *"I would so we don't risk losing the last 20 because she needed the $$ tonight."*
PERSON #1: *"Hey I'm just now heading to my friends cuz I had to wait 4 her to get home from her daughters. I'll be real quick in getting back I promise"*
PERSON #1: *"And I will have 30 more of them Friday along with 10 blue."*
MCDONALD: *"Ok"*

> PERSON #1: *"I just left"*
> PERSON #1: *"My friends house that is. I'm headed back home"*
> MCDONALD: *"Kk"*
> PERSON #1: *"I'll be home in 2 minutes"*
> MCDONALD: *"Omw"*

105.   On June 21, 2020, at 11:49AM, the following text message conversation took place:

> MCDONALD: *"Hey text or call me in the morning so I can grab the rest of them"*
> MCDONALD: *"U alive"*
> PERSON #1: *"I just woke up"*
> MCDONALD: *"Gotcha me too lol"*
> PERSON #1: *"On my way"*
> MCDONALD: *"Can I grab them greens ?"*
> PERSON #1: *"Swing by whenever u want"*
> MCDONALD: *"Ok"*
> PERSON #1: *"Let me know when you're headed this way so I can get them ready"*
> MCDONALD: *"Ill be down in a few...can u front them to me until she runs to her bank a lil later?"*
> PERSON #1: *"Sure"*
> MCDONALD: *"Kk thanks ill be down in a few mins"*
> PERSON #1: *"Anything 4 u guys"*
> PERSON #1: *"What time did u think you'll be coming by with that? I wanted 2 run & get a few groceries"*
> MCDONALD: *"Ill be down in a few mins"*
> PERSON #1: *"Awesome"*

106.   On June 23, 2020, at 9:24PM, the following text message conversation took place:

> MCDONALD: *"Its ok...Yea 2 please"*
> PERSON #1: *"Ok...Just text me tomorrow"*

107.   On June 26, at 2:12PM, 2020, the following text conversation took place:

> MCDONALD: *"Any greens"*

108.   On October 7, 2020, the following text conversation took place:

> PERSON #1: *"Hey just letting u know I'm awake now & remember u coming by..lol. Thanka 4 your help. Sorry I crashed before getting everything settled. Stress and Munste"*

> PERSON #1: *"r being nocturnal had me up for 3 days straight but I'm not losing 1 more Dollar 2 another crack head. Lol. Thank u again Mike"*
> PERSON #1: *"Oh and I have 3 more of the 15s if u wanna get them tomorrow"*

109.    On October 8, 2020, MCDONALD's account received a direct deposit from Company A in the amount of $993.18. At 3:35PM, two withdrawals were made in the amounts of $300.00 and $15.00 from the ATM located at 6100 Holabird Avenue, Baltimore, Maryland.

### MCDONALD's Drug Related Text Messages with Person #3 and ATM Withdrawals Between January 2020 and June 2020.

110.    On January 18, 2020, at 3:08PM, the following text message conversation took place:

> PERSON #3: *"Have tens"*
> MCDONALD: *"Where u at"*

111.    Seven minutes later that day, there was a withdrawal in the amount of $100 from MCDONALD's account at the Erdman Avenue ATM at 3:15PM. Based on my training, knowledge and experience, I believe that the $100.00 withdrawn from MCDONALD's account would have covered the cost of ten "tens." I base this belief in the knowledge that prescription drugs that are illegally sold are generally sold at a rate of $1.00-$2.00 per milligram, and that I believe "tens" to be a reference to a ten-milligram dose of Oxycontin, which is a common dosage prescribed. Therefore, at this rate, ten 10-milligram doses would have cost $100.00.

112.    On January 23, 2020, at 3:46PM, the following text message conversation took place:

> PERSON #3: *"Yo u gonna swing by?"*
> PERSON #3: *"15s"*
> MCDONALD: *"Ok ill grab 10 broski"*
> MCDONALD: *"My homeboy from work will wants to hook up with you again too"*
> MCDONALD: *"I want 10 greens and he wants 8...do u want to meet up with him or have him come to my house...he lives off martin blvd n compass rd."*

113.    Fifty-five minutes earlier, at 2:51PM, there were two withdrawals from

MCDONALD's account at an ATM at Eastpoint Mall in the amounts of $300.00 and $26.47. Based on the opening question posed by Person #3 in the text conversation as to whether or not MCDONALD was going to "swing-by," I believe that this meeting was pre-arranged at an earlier time, and based on the amount requested, I believe that MCDONALD would have needed at least $180.00 in order to purchase the 18 pills that he requested.

114.     On March 5, 2020, at 7:42AM, the following text message conversation took place:

> PERSON #3: *"What's up got 15s On my way! Home from work."*
> MCDONALD: *"Ok I got a bunch of pinks lasnite but ill see if the other 2 dudes want any for ya."*
> PERSON #3: *"Dam ok well On my way! Home to go to bed."*
> MCDONALD: *"Ok hit me up when u wake up and ill let u know."*

115.     Based on the conversation set forth in paragraphs 26, 28, 31, 32, 40, 44, and 114 above, and MCDONALD's historical habit of purchasing "pinks" from Person #2, I believe that in this conversation, MCDONALD is referring to his purchase of approximately 30 "pinks" from Person #2 that occurred the night before, and therefore, is declining the transaction suggested by Person #3.

116.     On March 28, 2020, at 11:00AM, the following text message conversation took place:

> MCDONALD: *"Whats up yo..i fell asleep real early yesterday. U good?"*
> PERSON#3: *"Good was looking for bud for my boy"*
> MCDONALD: *"What u got?"*
> PERSON #3: *"Nothing waiting on a call"*
> MCDONALD: *"Oh ok... is it supposed to be today"*

117.     On the same day, at 11:09AM, the following text message, which is a continuation of the conversation above, took place between MCDONALD and PERSON #3:

> PERSON #3: *"Just got a few 15s what u need to just popped up"*
> MCDONALD: *"ok cool"*
> MCDONALD: *"How many u have"*
> PERSON #3: *"8"*
> PERSON #3: *"I am home"*
> MCDONALD: *"Ok il be omw"*

118.     Also, on March 28, 2020, there was a withdrawal from MCDONALD's account in the

amount of $60.00 from the Chesapeake Park ATM at 12:32PM. Based on the proximity in time of the

withdrawal to the above conversation, I believe that MCDONALD made this withdrawal after

learning of Person #3's possession of eight "15's" and prior to meeting with Person #3. While $60.00

may not have fully covered the full cost of eight "15's" at the rate of $10.00-$15.00 per pill, I believe

that MCDONALD either had additional cash on hand or was "fronted" a portion of the payment,

because the balance in MCDONALD's account after that withdrawal was only $56.01.

119.    On April 12, 2020, at 5:46PM, the following text message conversation took place:

> MCDONALD: *"Ok yea I just told him to be ready n when I hit him up to tell me what truck hes gonna be driving either his blk dodge ram truck or green dodge Dakota but when your ready ill find out exactly what he's driving...thanks bro"*
> PERSON #3: *"Tell him to go"*
> MCDONALD: *"Okay"*
> MCDONALD: *"Green dodge Dakota bro hes on his way"*
> MCDONALD: *"Going to food lion by taco bell on martin blvd"*
> PERSON #3: *"Ok how many"*
> MCDONALD: *"10"*
> PERSON #3: *"Tell him on the side"*
> MCDONALD: *"Ok hes on 40 now so he will be there in a couple mins n I told him u are parked on the side of food lion n what u are driving"*
> MCDONALD: *"Hes on martin blvd now"*

120.    Based on my training, knowledge and experience, as well as the context of the

conversation, I believe that in these text messages, MCDONALD was facilitating a transaction

between Person #3 and another unknown person.

121.    On April 13, 2020, at 2:12PM, the following text conversation took place:

> MCDONALD: *"Yo can I get some pinks"*

122.    On April 17, 2020, at 2:39PM, the following text message took place

> PERSON #3: *"Few 15s left"*
> PERSON #3: *"Few left"*
> MCDONALD: *"How many"*
> MCDONALD: *"Yo call me for 3seconds fuck this texting. Just need to know how many cuz shes getting money and may just buy them all"*
> MCDONALD: *"She will be back in ten mins or so then ill head to you bro. Sorry bout all*

*this back and fourth that's y I just wanted u to call or answer rite quick."*
PERSON #3: *"Like 24"*
MCDONALD: *"Ok sges grabbing loot n then ill be over."*
MCDONALD: *"omw bro..20"*
MCDONALD: *"Im here"*

123.    On April 30, 2020, at 1:51PM, the following text message conversation took place:

PERSON #3: *"Got 15s leaving at 5"*
MCDONALD: *"Ok...im gonna head to u now"*

124.    At 3:19PM that same day, there was a withdrawal in the amount of $300 from

MCDONALD's account at Chesapeake Park ATM.

125.    On June 18, 2020, at 2:58PM, the following text message took place:

MCDONALD: *"Wtf is going on bro?? Anything lined up"*
PERSON #3: *"Nope"*
MCDONALD: *"Jesus"*
PERSON #3: *"I know"*
MCDONALD: *"Fucking insane man. Mfkrs at work paid $10 for 5s and $25 fuckn bones for 15s today at work. I told dude if it wasn't at work id rob that mfkr lmfao wtf...who da fuck pays that?*
PERSON #3: *"Desperate people"*
MCDONALD: *"Im good bro ifound some"*

126.    Based on my training, experience and knowledge, as well as the context of the text

messages, I believe that in this conversation, MCDONALD attempted to purchase more "15's" from

Person #3, but that Person #3 did not have any to sell.  I further believe that MCDONALD's last

response indicated that he found another supplier from whom he was able to buy the pills.

**Pen Register Data, Physical Surveillance and ATM Withdrawals from MCDONALD's Bank**
**Account Between November 11, 2020 to September 6, 2021.**

127.    Since July 22, 2020, the FBI has conducted periodic physical surveillance of

MCDONALD in order to establish his normal pattern of activity and to attempt to collect evidence of

criminal activity. Efforts to date have established a baseline pattern of activity that demonstrates that

MCDONALD would generally leave his residence in the early morning hours for work, sometimes as early as 4:30AM. Several times per week, MCDONALD would go to either Person #1, Person #2 or Person #4's residence, or meet Person #3 at various locations, during the afternoon or evening before returning to his residence (**TARGET LOCATION #1**). This pattern of behavior continued after MCDONALD ended his employment at Company A in November 2020, and began working at Company B, and it has continued as recently as September 20, 2021.

128. MCDONALD's bank records reflect that over that same period of time, there was often a corresponding withdrawal or withdrawals from MCDONALD's account from an ATM machine in amounts that were generally consistent with the cost of purchasing the illegal substances identified in paragraph 20.[8]

129. I have compared the available pen register data, MCDONALD's bank records, location data and the results of the physical surveillance of MCDONALD for the period October 8, 2020 to October 28, 2021. As set forth below, that comparison establishes that MCDONALD's pattern of activity, namely contact with one of his drug suppliers near in time to an ATM withdrawal, as detailed above in paragraphs 24 through 126, has continued after the seizure of Cellphone-1 and Cellphone-2 on October 7, 2020.[9]

---

[8] The records obtained to date for MCDONALD's account show activity through September 30, 2021.

[9] As indicated in paragraphs 15 and 16, the Court issued Pen-Register/Trap and Trace orders for Cellphone #3 for the periods November 2, 2020, to December 30, 2020, and January 6, 2021, through March 6, 2021, and for Cellphone-4 for the period of August 16, 2021, through October 15, 2021. The information obtained from that electronic monitoring reflected continued and frequent contact between MCDONALD's cellphones and the telephone numbers associated with Person #1, #2, #3 and #4 ("the drug suppliers"). Specifically, there were 27 phone calls and 173 text messages with Person #1 between November 2, 2020 and March 6, 2021; 1 phone call and 270 text messages with Person #2 between November 2, 2020, and March 6, 2021; 115 text messages with Person #3 between November 2, 2020 and March 6, 2021; and 8 phone calls and 222 text

130.    On November 14, 2020, MCDONALD's telephone had 12 text message contacts with Person #3's telephone beginning at 12:38PM. Fifteen minutes later, at 12:55PM, there was a withdrawal from the Chesapeake Park ATM in the amount of $300.00.

131.    On November 15, 2020, MCDONALD's telephone had 1 text message contact with Person #3's telephone, which occurred at 11:43AM. At 11:24AM, there was a withdrawal from an ATM located at 2401 North Point Avenue in the amount of $103.00.

132.    On November 16, 2020, MCDONALD's telephone had 11 text message contacts and three calls with Person #2's telephone, which began at 3:48PM. Approximately two hours later, there were two withdrawals from the Dundalk Avenue ATM. The first was in the amount of $200.00 at 5:44PM, and the second was in the amount of $100.00 at 5:45PM.

133.    On November 25, 2020, MCDONALD's telephone had 16 text message contacts with Person #2's telephone between 11:10AM and 4:00PM. On the same day, there were two withdrawals at an ATM located at 6100 Holabird Avenue. The first withdrawal at 1:21PM was in the amount of $200.00. The second withdrawal in the amount of $100.00 occurred at 1:22PM. Person #2's residence is approximately 2 miles from that ATM.

134.    On November 26, 2020, MCDONALD's telephone had 14 text message contacts with Person #2's telephone between 11:19AM and 5:30PM. On the same day, there were two withdrawals from the Dundalk ATM: one for $200.00 at 11:50AM and the second for $100.00 at 11:51AM.

messages with Person #4 between November 2, 2020 through March 6, 2021 and August 16, 2021 through October 15, 2021.

33

135. On November 27, 2020, MCDONALD's telephone had 10 text message contacts with Person #2's telephone between 12:14 and 1:07PM. There were two withdrawals from an ATM located at 6201 Pulaski Highway, in the amounts of $200.00 at 11:29 AM and $100.00 at 11:30AM.

136. On November 28, 2020, MCDONALD's telephone had 10 text message contacts with Person #3's telephone between 2:32PM and 3:08PM. On the same day, there was a withdrawal at the Chesapeake Park ATM in the amount of $300.00 at 2:57PM.

137. On November 29, 2020, MCDONALD's telephone had 13 text message contacts with Person #4's telephone between 10:04AM and 4:50PM. At 4:34PM that day, there was a withdrawal at the ATM located at 6201 Pulaski Highway, in the amount of $150.00.

138. On December 10, 2020, MCDONALD's telephone had 10 text message contacts with Person #4's telephone between 7:12PM and 9:49PM. On the same day, there were two withdrawals at the Erdman Avenue ATM in the amounts of $200.00 at 7:03PM and $100.00 at 7:04PM.

139. On December 22, 2020, MCDONALD's telephone had 5 text message contacts with Person #1's telephone between 11:14AM and 6:34PM. On the same day, there were two withdrawals at the Chesapeake Park ATM in the amounts of $200.00 at 7:13PM and $100.00 at 7:29PM.

140. On December 23, 2020, MCDONALD's telephone had 23 text message contacts with Person #2's telephone between 10:35AM and 6:36PM. At 2:12PM, there was a withdrawal at the Dundalk Avenue ATM in the amount of $200.00. Eleven minutes later, on the same day, at 2:23PM, law enforcement agents saw MCDONALD drive the beige Toyota Tundra pickup truck bearing Maryland tag 6DB5198 (**TARGET LOCATION #3**) (hereinafter referred to as "the Toyota Tundra") to Person #2's residence. MCDONALD went into the residence for two minutes and then drove away.

141. On December 24, 2020, MCDONALD's cellphone had contact with Person #4's

34

telephone six times 8:05PM and 8:54PM. At 8:42PM, there was a withdrawal in the amount of $60.00 from MCDONALD's account at the ATM located at 6201 Pulaski Highway, which is nine miles from Person #4's residence. Fourteen minutes later, at 8:56PM, location data received from MCDONALD's cellphone reflected a location in the vicinity of Person #4's residence.[10]

142.    On December 26, 2020, data from the pen register showed that MCDONALD's cellphone had contact with Person #4's telephone eight times between 11:30AM and 11:48AM. Location data received from MCDONALD's cellphone revealed its location to be in the vicinity of Person #4's residence on the same day at 12:11PM. MCDONALD's bank account records further reflect that on December 26, 2020, his account had a negative balance of -$1.22. Based on this balance, in conjunction with the large withdrawal of $850.00 that occurred on December 23, 2020; however, it is reasonable to conclude that MCDONALD had enough cash on hand in order to purchase illegal substances from Person #4 at that time.

143.    On January 19, 2021, at 4:24 PM, MCDONALD's cellphone had contact with Person#1's telephone. Law enforcement agents performing a physical surveillance saw MCDONALD drive the Toyota Tundra (**TARGET LOCATION #3**) from his place of work at 5501 Holabird Avenue, to Person #1's residence, where he arrived at 4:45PM. MCDONALD went into Person #1's residence, stayed inside for about seven minutes, and then got back into the Toyota Tundra and drove to his own residence (**TARGET LOCATION #1**).

144.    On February 10, 2021, at 3:08PM, law enforcement agents performing surveillance observed MCDONALD drive the Toyota Tundra (**"TARGET LOCATION #3)** from 5501 Holabird Avenue to the Royal Farms store where the Dundalk Avenue ATM is located. Three minutes later, at

---

[10] At 4:42PM on the previous day, there were two withdrawals from MCDONALD's account in the amounts of $850.00 and $100.00 from that same ATM.

3:11PM, a withdrawal of $100.00 was made from MCDONALD's account from the Dundalk Avenue

ATM. A minute later at 3:12PM, MCDONALD arrived at Person#2's address in the Toyota Tundra.

He entered the residence and stayed inside for two minutes. MCDONALD then drove the Toyota

Tundra back to 5501 Holabird Avenue.

145.    An hour and thirty-seven minutes later, at 4:51PM, MCDONALD left his place of

work on Holabird Avenue and drove to Person #1's residence, where he spent one minute inside

before driving to his own residence (**TARGET LOCATION #1**). Nineteen minutes later at 5:10PM,

MCDONALD departed his residence in a dark colored minivan bearing Maryland tag 5EG7122

(**TARGET LOCATION #4**) (hereinafter referred to as the "minivan"). MCDONALD drove to the 7-

11 store where the Erdman Avenue ATM is located and went into the store for one minute.

MCDONALD's bank records indicate that at 5:10PM that day, there was a withdrawal of $80.00 from

the Erdman Avenue ATM. MCDONALD drove the minivan back to Person #1's residence, where he

spent five minutes inside before re-emerging and driving to his residence (**TARGET LOCATION**

**#1**). At 5:50PM, MCDONALD drove the minivan to Person #2's residence where he spent one

minute inside, before driving back home again. While the pen register data does not reflect contact

with Person #1 or Person #2 on February 10, 2021, I believe that MCDONALD and Person #2 may

not have coordinated prior to his meeting with Person #1 and Person #2. As indicated in the preceding

paragraphs, MCDONALD has established a baseline pattern of behavior in which he routinely visits

both Person #1 and Person #2, and the visits do not always appear to be pre-planned.

146.    Based on my training, knowledge and experience, I believe that the frequent trips to

and from the Dundalk Avenue and Erdman Avenue ATMs, and the frequent trips to and from Person

#1 and Person #2's residences as explained in the preceding paragraphs indicate that MCDONALD

attempted to make several purchases of controlled substances from Person #1 and Person #2. Based

on my experience investigating drug trafficking offenses, I know that suppliers often receive amounts of controlled substances and then quickly sell out of supply due to high demand from customers despite having previously made arrangements with long-time customers. Therefore, I believe in this instance, MCDONALD attempted a purchase with Person #2 at 3:12PM, which may or may not have been successful. MCDONALD then attempted a purchase from Person #1 at 4:51PM, which also may or may not have been successful. Finally, at 5:50PM, MCDONALD attempted a second purchase with Person #2.

147.    On January 21, 2020, MCDONALD's cellphone had 3 text message contacts with Person #2's telephone between 7:11PM and 7:12PM. On the same day, there were two withdrawals at the Dundalk Avenue ATM in the amount of $200.00 at 7:02PM and $100.00 at 7:03PM.

148.    On January 24, 2020, MCDONALD's telephone had 6 text message contacts with Person #4's telephone between 4:56PM and 5:09PM. On the same day, at 5:20PM, there was a withdrawal at the ATM located at 8314 Pulaski Highway, in the amount of $123.00. That ATM is located six miles from Person #4's residence.

149.    On February 5, 2021, MCDONALD's cellphone had 8 text message contacts with Person #3's telephone between 6:04PM and 7:13PM. On the same day, there were two withdrawals at an ATM located at 6201 Pulaski Highway, one in the amount of $200.00 at 7:18PM and the other in the amount of $100.00 at 7:19PM.

150.    On February 9, 2021, beginning at 1:49PM, MCDONALD's cellphone had contacts with Person #2's telephone. The next day, on February 10, 2021, at 3:05PM, law enforcement agents performing a physical surveillance of MCDONALD saw him drive the Toyota Tundra (**TARGET LOCATION #3**) to the Royal Farms store where the Dundalk Avenue ATM is located. MCDONALD spent two minutes inside the store. MCDONALD then drove to Person #2's

residence where he arrived at 3:10PM and spent two minutes inside the residence. MCDONALD's bank records indicate that there was withdrawal in the amount of $100.00 from the Dundalk Avenue ATM, which posted at 3:11PM.[11]

151.    On February 17, 2021, at 5:17PM, law enforcement agents performing a physical surveillance saw MCDONALD drive the Toyota Tundra (**TARGET LOCATION #3**) to the vicinity of Person #2's residence, exit the Tundra, and walk towards Person #2's residence. Several minutes later, agents observed MCDONALD walk back to the Toyota Tundra and then drive to his residence. One day later, MCDONALD's account reflected two withdrawals from the Dundalk Avenue ATM consisting of $200.00 at 2:10PM and $100.00 at 2:48PM.

152.    On March 5, 2021, MCDONALD's telephone had 1 text message contact with Person #3's telephone at 12:56PM. On the same day, at 10:54AM, there was a withdrawal at an ATM located at 2333 Eastern Boulevard in the amount of $580.00 That ATM is three miles from Person #3's residence.

153.    On July 29, 2021, at 4:19 PM, law enforcement agents performing a physical surveillance saw MCDONALD drive the minivan (**TARGET LOCATION #4**) to Person #1's residence. MCDONALD walked to the front door of the residence and stood in the open doorway. After approximately 2 minutes, MCDONALD left and drove back to his residence (**TARGET LOCATION #1**). That same day, there was a withdrawal from MCDONALD's account in the amount of $60.00 from the ATM located at 6201 Pulaski Highway.

154.    On July 29, 2021, at 7:12 PM, law enforcement agents observed MCDONALD

---

[11] I believe that the one-minute difference in times is a discrepancy between the time kept by the ATM at that location and the device used by the law enforcement agent who was conducting the surveillance.

drive the minivan (**TARGET LOCATION #4**) to the Royal Farms store located at 6201 Pulaski Highway. MCDONALD entered the store and then left several minutes later. MCDONALD's bank records reflect that on that day, there was a $40.00 withdrawal from an ATM located inside that store. MCDONALD then drove the minivan to the Eastpoint Mall, where he parked next to a grey sedan that is registered with the Maryland Department of Motor Vehicle in the name of Person #3. A white male got out of the sedan and walked over to the passenger side of MCDONALD's minivan. The male appeared to have a brief conversation with MCDONALD and then returned to the sedan. Law enforcement agents were not able to see if the MCDONALD exchanged anything with the male during the brief encounter. Law enforcement agents then saw the male drive to Person #3's address and enter the residence using a key. Person #3's driver's license photograph appears to be t that of the same person captured in photographs taken by the surveilling law enforcement agents of that encounter. Based on my training, knowledge and experience, and my knowledge of this investigation, I believe that MCDONALD purchased illegal controlled substances from Person #3 in the observed encounter.

155.    On August 6, 2021, MCDONALD's account received a direct deposit from Company B in the amount of $1,937.89. On the same day, there were two withdrawals from the Dundalk Avenue ATM in the amounts of $100.00 and $200.00.

156.    On August 16, 2021, there were two outgoing calls at 9:34AM and 9:35AM from Cellphone-4 to the number belonging to Person #4. On that same day, there was a withdrawal from MCDONALD's account in the amount of $180.00[12] from an ATM at 10740 Pulaski Highway in

---

[12] As noted previously, the records for MCDONALD's account for the year 2021 did not include times of transactions. Based on the distance from MCDONALD's residence to the ATM used on that day, which was nine miles, and its proximity to Person #4's residence, which was less than a mile, I believe that that withdrawal was made in relation to the calls to Person #4's telephone.

White Marsh, Maryland.

157.    On September 3, 2021, MCDONALD's account received a direct deposit in the amount of $1,955.50 from Company B.  Two days later, on September 5, 2021, MCDONALD's cellphone had contact with Person #4 's telephone and there was a withdrawal from MCDONALD's account in the amount of $180.00 from the ATM located at 10740 Pulaski Highway. The location of that ATM is approximately one mile from Person #4's residence.

158.    On September 7, 2021, at approximately 5:57PM, law enforcement agents observed MCDONALD drive the minivan (**TARGET LOCATION #4**) to Person #4's residence. Approximately two minutes later, law enforcement agents observed MCDONALD step off of the front porch of Person#4's residence, get into the minivan and drive back to his own residence (**TARGET LOCATION #1**).  MCDONALD's bank records do not show a withdrawal on that day.

159.    On September 17, 2021, MCDONALD's account received a direct deposit from Company B in the amount of $2,346.14. Three days later, on September 20, 2021, there were two withdrawals from MCDONALD's account at the Dundalk ATM. The first withdrawal was in the amount of $200.00, and the second withdrawal was in the amount of $40.00.

160.    On October 28, 2021, at approximately 5:57PM, law enforcement agents observed MCDONALD drive the minivan (**TARGET LOCATION #4**) to Person #4's residence.  After spending two minutes inside, MCDONALD exited the residence and returned to his own residence (**TARGET LOCATION #1**).

### *Other Evidence of MCDONALD's Use of Unlawful Controlled Substances*

161.    According to records obtained in December 2020 from Company A, MCDONALD entered into an Emergency Action Plan ("EAP") agreement with Company A on September 24,

2020, as a condition of his continued employment. The EAP, which was for treatment and mitigation of drug and alcohol abuse, required MCDONALD to submit to regular urinalysis screens and to attend a series of therapeutic group sessions at a local treatment center. According to a representative from Company A, the company has no records reflecting whether MCDONALD ever actually participated in the group sessions and he ceased working for Company A as of November 20, 2020.

162.    During the execution of the search warrant of MCDONALD's residence on October 7, 2020, which is further referenced in paragraph 13 above, a plastic container of an amber fluid was found in the refrigerator of the residence, which MCDONALD described as "piss" for "drug tests at work." That container was not seized. Based on my training, knowledge and experience, I know that users of illegal controlled substances that are subjected to drug screens for employment frequently keep "clean" urine that does not contain traces of illegal controlled substances. It has often been my experience that users of illegal controlled substances save the urine of others in containers, in preparation for the screenings.

**Evidence of MCDONALD's Possession of Firearms**

163.    In a YouTube video (https://www.youtube.com/watch?v=6mrAYKknc0E) uploaded by user DEVINCI 4DCLEVER, originally streamed live on the website on or about December 22, 2020, MCDONALD appeared as a guest of the host and discussed a range of issues including protesting in Washington, D.C. on January 6, 2021. In the video, MCDONALD stated that he was grabbing items including his "pistol and cigarettes" before going to his front porch; implying that he had a firearm in his possession at the time of the video. On October 7, 2020, I interviewed MCDONALD face-to-face and saw the interior of MCDONALD's residence during the execution of the search warrant described in paragraph 15 of the attached affidavits. Based on that prior knowledge

and experience, I was able to positively identify that MCDONALD was the person speaking in the video and that the location of MCDONALD during the video was inside of his residence located at 5043 Wright Avenue, Baltimore, Maryland.

164.    MCDONALD's bank account records reflect a $383.94 debit on January 11, 2021, for Adventure Survivalist, a firearms parts retailer located in Florida that advertises "AR-15 building kits[13]." That same day, a transaction was posted to MCDONALD's account in the amount of $34.99 for Rifle Supply Company, which is a firearms parts retailer located in California that also advertises "AR-15 building kits."

165.    On January 15, 2021, MCDONALD contacted me by telephone.[14] During the ensuing conversation, MCDONALD asked me if he was able to purchase a firearm. I informed him that I could not tell him whether he could or could not purchase a firearm and that I could not provide him with legal advice. MCDONALD then asked me if he could purchase thirty (30) round capacity magazines and if he needed a lawyer. Again, I told MCDONALD that I could not tell him what he could or could not do, and that I could not provide him with legal advice. MCDONALD then told me that he had purchased some thirty round magazines and that he had also recently purchased a Armalite semi-automatic rifle ("AR-15"), but that it was in "parts." MCDONALD then mentioned the term "80%," which I believe, based on my training, knowledge and experience, to be a reference to an 80%

---

[13] "AR-building kits" are packages sold by firearms distributors that include the internal mechanisms for firearms, which in this case, is an AR-15 rifle. Kits generally include the components used to build the trigger housing group, buffer-spring, which absorbs the recoil of the rifle into the stock, take-down pins which hold all of the parts in the lower received as well as additional internal mechanisms, springs and coils. Other parts included are "pistol grips," upper receivers including gas tubes and chambers, and accessories such as sights and rails depending on the kit purchased. In summation, these kits contain all of the parts needed to successfully build a functioning firearm.

[14] The call was routed to me through the Federal Bureau of Investigation, Baltimore Division's switchboard.

lower receiver, which is commonly referred to as a "ghost-gun" because the consumer is not required to serialize[15] the finished firearm. Additionally, the term "80%" refers to the state of the lower receiver, meaning that the receiver is 80% complete and only requires minimal machining to be completed and assembled into a fully functioning firearm. By definition, a lower receiver is considered a firearm according to Title 18 U.S.C. § 921(a)(3)(B), which states in relevant part:

> The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon ....

166.   On January 21, 2021, MCDONALD posted the following comment regarding his building an AR-15 to his publicly available Wimkin:

---

[15] According to 27 CFR §478.92, licensed firearms manufacturers and importers are required to serialize their firearms prior to sale, import or export of those firearms by stamping, engraving or casing serial numbers on the frame, barrel or the lower receiver.



**MCDONALD's Use of Cellphone-4**

167.    On June 29, 2021, MCDONALD contacted me by calling the FBI Baltimore switchboard from call number (443) 804 0759 (hereinafter "Cellphone-4"). During that conversation, MCDONALD admitted that (443) 804 0759 was his "new number."

168.    Information obtained from the Pen Register/Trap and Trace Order issued for Cellphone-4 on August 16, 2021, as referenced paragraph 16, reflects that on September 5, 2021, there were two outgoing calls to Person #4, as detailed in paragraph 157. There were no other contacts between Cellphone-4 and any of the previously identified drug suppliers. The data also showed that MCDONALD did not use Cellphone-4 to make calls consistent with his normal pattern of contacts, such as calling his spouse, and that the level of activity and volume of data sets

on Cellphone-4 was markedly less than that observed on MCDONALD's previous cellphones.

169.    Based on my training, knowledge and experience, I know that frequently changing cellular phone numbers and devices, as well as using multiple cellphones at the same time, are common practices by those involved in the illegal drug trade in order to attempt to evade detection by law enforcement. Following the seizure of Cellphone-1 and Cellphone-2 in October 2020, MCDONALD has changed his cellphone number at least twice. In addition, due to the limited activity and volume of data sets on Cellphone-4, I believe that MCDONALD is currently using a second cellphone with an unknown number and that he uses that cellphone to continue to contact one or more of the drug suppliers in order to purchase illegal controlled substances.

**Evidence Relating to MCDONALD's Tax Violations**

170.    An Internal Revenue Service ("IRS") Special Agent involved in this investigation has advised me that IRS records show that for the years 2016 through 2018, MCDONALD failed to file federal individual income tax returns. The agent also advised me that MCDONALD last filed a federal individual income tax return for the 2015 year as "Head of Household."

171.    The IRS agent has also advised me that MCDONALD's employment records and IRS records reflect that MCDONALD had unreported taxable income in the form of W-2 wages for the tax years 2016 through 2018 from his employer, Company A, for which he was required to file a federal tax return.

172.    Company A records reflect that between in or about October 20, 2015, to April 16, 2018, MCDONALD changed his federal withholding status on approximately 13 different occasions. MCDONALD most frequently opted to utilize the special withholding tax status of "Maintain taxable gross." A Company A representative has advised that that election status was equivalent of claiming an

exemption from withholding on a physical Form W-4. At various dates, MCDONALD also claimed no special withholding tax status, but claimed anywhere from 4 to 9 withholding allowances.[16]

173.    The IRS agent further indicated that MCDONALD's actions and messages, as set forth below in paragraphs 175 and 176 are typical of "tax defiers," or persons who exploit what they perceive to be legal "loopholes" in the United States Tax Code which they share with co-conspirators via publications, pamphlets and manuals.  Information regarding these practices is readily available on the Internet and is shared in electronic form across social media and messaging platforms.

174.    During the search of Cellphone-2, I located evidence indicating that the cellphone had been used to conduct internet research regarding such practices.  For example, I located the following screenshot of a YouTube video about not paying income taxes:



---

[16] MCDONALD declared those allowances, but for the tax years 2016 through 2018, his identified dependents were declared on the individual returns filed by others.

175.    I have located on MCDONALD's publicly available Facebook accounts at least two instances in which he made statements indicating that he did not pay his taxes, that he disagreed with the laws requiring him to file tax returns and urged others to not file tax returns. In one of the postings, MCDONALD also indicated that his employers pay taxes on his behalf and therefore, he believes that he is not required to pay any taxes. Those Facebook postings were dated July 1, 2020, and August 7, 2020.

176.    I also located the following outgoing text messages, dated January 12, 2020, on Cellphone-2:

> MCDONALD: *"And if we don't pay taxes they throw us in jail or send cops to kill us so basically we gotta pay what they want or lose our lives. Well im not paying come get me and their shit better be bigger than mine... in I doubt it cause ill blow the whole block up"*
> MCDONALD: *"Im free trust me and im not paying them shit!! Fuck the system."*

177.    On November 10, 2021, a Federal Grand Jury empaneled in the United States District Court for the District of Maryland returned an Indictment, currently under seal in Criminal Case No. GLR-21-0444, charging MCDONALD with three counts of 26 U.S.C. § 7201 (Tax Evasion), and four counts of 26 U.S.C. § 7203 (Willful Failure to File Tax Return).

**The Target Locations**

178.    As mentioned in paragraph #13, **TARGET LOCATION #1** is where MCDONALD resides. Law enforcement agents executed a search warrant at the location in October 2020 and confirmed at that time that MCDONALD lived there.  Since that time, law enforcement agents have observed MCDONALD on numerous occasions entering or leaving that residence, including as recently as November 17, 2021. In addition, current Maryland Department of Motor Vehicles records of

MCDONALD's driver's license and vehicle registrations list **TARGET LOCATION #1** as his residence.

179.    **TARGET LOCATION #2** is the body of MCDONALD. Based on my training and experience, and my knowledge gained during this investigation, I know that users of illegal controlled substances often carry such substances on their person and that controlled substances such as Oxycodone and Morphine Sulfate remain in a user or addict's blood stream for some period after use. Accordingly, I submit that there is probable cause to search the person of MCDONALD and to draw and test MCDONALD's blood, as described in Attachment B-2, to obtain evidence that he is a current user or an addict of Oxycodone and/or Morphine Sulfate in violation of 18 U.S.C.§ 922(g)(3).

180.    **TARGET LOCATION #3** is a Toyota Tundra truck which is currently registered to MCDONALD. Law enforcement agents have seen MCDONALD drive the Toyota Tundra to work, to meet his drug suppliers, and to various other locations numerous times over the past year, including as recently as November 17, 2021.

181.    **TARGET LOCATION #4** is a Chrysler Pacifica minivan which is also currently registered to MCDONALD. Law enforcement agents have observed MCDONALD drive the minivan numerous times, including to meet one of his drug suppliers as recently as October 28, 2021.

182.    Based on my training and experience, and my knowledge gained during this investigation, I also know that users of illegal controlled substances and illegally possessed firearms store or maintain such substances, as well as firearms, within their residences and vehicles; both for easy access and concealment. Therefore, I submit that there is probable cause to search the premises of 5043 Wright Avenue, Baltimore, Maryland, (**"TARGET LOCATION #1"**), MCDONALD's Toyota Tundra (**TARGET LOCATION #3**), and the minivan (**TARGET LOCATION #4**), for those items, as more fully described in Attachments B-1, B-3 and B-4.

48

183.    I am also aware that employers provide tax documents to their employees in the form

of physical and digital W-2 documents as well as but limited to Forms 1099-MISC, 1099-A, 1099-B,

1099-DIV, 1099-INT, 1099-K, amended or pending forms, and records indicating the status of those

forms. Based on my training, knowledge and experience, I know that most employed individuals

maintain personal and financial records and files, regardless of the individuals' criminal activities, and

that it is a common practice for such individuals to keep the records and files within their residences

for safekeeping. Therefore, I submit that there is probable cause to believe that records and files,

either in electronic or physical form, will be found within **TARGET LOCATION #1,** and that those

records and files will contain information relevant to violations of 26 U.S.C. § 7201 and 26 U.S.C.

§ 7203, as more fully described in Attachment B-1.

## CONCLUSION

184.    Based on the facts set forth above, I submit that there is probable cause to believe that

MCDONALD willfully possesses illegal controlled substances in violation of 21 U.S.C. § 844, that he

is a habitual user of illegal controlled substances while in possession of a firearm in violation of 18

U.S.C. § 922(g)(3), that he has committed tax evasion in violation of 26 U.S.C. § 7201, and that he

has failed to file income tax returns in violation of 26 U.S.C. § 7203.  I further submit that there is

probable cause to believe that MCDONALD lives at **TARGET LOCATION #1,** that he regularly

drives **TARGET LOCATIONS #3 and #4,** and that those locations, as well MICHAEL LEE

MCDONALD, the person (**TARGET LOCATION #2**), contain evidence, fruits, instrumentalities,

and/or evidence of those violations.

185.    Wherefore, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, I

respectfully request warrants to search the locations described in Attachments A-1, A-3 and A-4 and a

21 - 3 2 3 9  ADC

warrant to search the person identified in Attachment A-2, and authority to seize those items 21 - 3 2 4 2  ADC

identified in Attachments B-1 through B-4.

Dated: November 23, 2021                    Respectfully submitted,

*Sean O'Rourke*
_____
Sean O'Rourke, Special Agent
Federal Bureau of Investigation

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on November 23, 2021.

_____
Honorable A. David Copperthite
United States Magistrate Judge

## <u>ATTACHMENT A-1</u>
### Property to Be Searched

The location to be searched is located at 5043 Wright Avenue, Baltimore, Maryland 21205 ("**TARGET LOCATION #1**"). This warrant authorizes law enforcement to search the entire property, including the residence, curtilage and any other structures, outhouses, appurtenances or vehicles thereon. **TARGET LOCATION #1** is depicted below, identified with a red circle.



1

**ATTACHMENT A-2**
**Person to be Searched**

The person of Michael MCDONALD, **("TARGET LOCATION #2")** born September 5th, 1981, Social Security Account Number ending in -0223, described as a white male, approximately 5 feet 10 inches and weighing 200 pounds, with brown hair and hazel eyes, as pictured below.



**ATTACHMENT A-3**
**Place to be Searched**

Toyota Tundra truck (**TARGET LOCATION #3**), beige in color, bearing Maryland registration tag number 6DB5198, and Vehicle Identification Number (VIN) 5TBBT441X1S138565, which is registered to MICHAEL LEE MCDONALD as of November 21, 2021.

**ATTACHMENT A-4**
**Place to be Searched**

Chrysler Pacifica minivan (**TARGET LOCATION #4)**, navy in color, bearing Maryland registration tag number 5EG7122, and Vehicle Identification Number (VIN) 2C4RC1CG8LR132401, which is registered to MICHAEL LEE MCDONALD as of November 21, 2021.

1

**ATTACHMENT B-1**
**Particular Things to be Seized**

All items and records, in whatever form they exist, that constitute evidence, fruits, contraband and instrumentalities of violation of 18 U.S.C. § 922(g)(3) (Prohibited Possessor of Firearm), 21 U.S.C. § 844 (Possession of Controlled Substance), 26 U.S.C. § 7201 (Tax Evasion) and 26 U.S.C. § 7203 (Failure to File Tax Return) (collectively "TARGET OFFENSES"), including but not limited to:

1. Financial records indicating financial gain as a result of tax evasion;

2. Caches of United States currency;

3. Communications and documents to any individual or group regarding conspiracy or collusion to evade taxes or failure to file tax returns;

4. Communications, receipts or other documents corresponding to educational materials relating to taxes or the United States tax system;

5. Forms filed, both digital and hard-copy, to include but not be limited to Forms 1099-MISC, 1099-A, 1099-B, 1099-C, 1099-DIV, 1099-INT and 1099-K, including any amended or pending Forms, or records indicating the filing status of each form;

6. Firearms, firearm equipment and ammunition of any kind;

7. Records related to firearms, ammunition, weapons or Federal income taxes;

8. Controlled substances; both prescription and illicit;

9. Indicia of substance abuse, to include paraphernalia and apparatuses by which to abuse illegal controlled substances;

10. Appointment books, diaries, calendars, work schedules phone numbers, email addresses and real property addresses;

11. Indicia of occupancy, rental and/or use of the premises described herein including but not limited to; utility bills, rental agreements and keys;

12. Any and all photographs, including still photos, negatives, video recordings, films, undeveloped film and the content therein;

13. Computers, computer hardware, software, related documentation, passwords, data security devices (as described below), videotapes and or video recording devices, and data that

1

constitute instrumentalities of, or contain evidence related to, the TARGET OFFENSES. The following definitions apply to the terms as set out in this affidavit and attachment:

a. Computer hardware: Computer hardware consists of all equipment, which can receive, capture, collect, analyze, create, display, convert, store, conceal or transmit electronic, magnetic of similar computer impulses or data. Hardware includes any data-processing devices (including but not limited to cellular telephones, central processing units, laptops, tablets, e-Readers, notes, iPads, and iPods; internal and peripheral storage devices such as external hard drives, thumb drives, SD cards, flash drives, USB storage devices, CDs and DVDs, and other memory storage devices); peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, and related communications devices such as cables and connections), as well as any devices mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

b. Computer software is digital information, which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs   to run operating systems, applications, and utilities.

c. Documentation: Computer-related documentation consists of written, recorded, printed, or electronically stored material, which explains or illustrates how to configure or use computer hardware, software, or other related items.

d. Passwords and Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touches. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it. As used above, the terms "records, documents, messages, correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials, created, modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

14. For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or

2

that might contain things otherwise called for by this warrant:

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f. evidence of the times the COMPUTER was used;

g. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER; contextual information necessary to understand the evidence described in this attachment.

15. With respect to the search of any of the items described above which are stored in

a. the form of magnetic or electronic coding on computer media or on media capable of being read

b. by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives,

c. flash drives, hard disk drives, or removable digital storage media, software or memory in any form),

d. the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized

3

as set forth herein, while permitting government examination of all the data
necessary to determine whether that data falls within the items to be seized):

   i.  surveying various file "directories" and the individual files they contain
(analogous to looking at the outside of a file cabinet for markings it contains and
opening a drawer believed to contain pertinent files);

   ii.  "opening" or cursorily reading the first few "pages" of such files in order to
determine their precise contents;

   iii.  "scanning" storage areas to discover and possible recover recently deleted
files;

   iv.  "scanning" storage areas for deliberately hidden files;

   v.  or performing key word searches or other search and retrieval searches through
all electronic storage areas to determine whether occurrences of language
contained in such storage areas exist that are intimately related to the subject
matter of the investigation.

16. If after performing these procedures, the directories, files or storage areas do not
reveal evidence of the specified criminal activity, the further search of that particular
directory, file or storage area, shall cease.

17. With respect to the electronic devices and COMPUTER equipment, law enforcement
seize all data and information on the devices and equipment but is authorized to look
for evidence, fruits, contraband, and instrumentalities regarding the TARGET
OFFENSES only from January 1, 2016, through the present.

18. If it is determined that one or more of the electronic devices can be enabled with
"Touch ID," law enforcement officers will be authorized to press the fingers
(including thumbs) of MCDONALD to the Touch ID sensor of the electronic device,
for the purpose of attempting to unlock the device via Touch ID in order to search
the contents as authorized by these warrants. Law enforcement will not use force to
effect this biometric authorization, and will instead explain the warrant's
requirement to the individual in order to gain compliance.

19. If determined that one or more of the electronic devices can be enabled with facial
recognition, law enforcement officers will be authorized to hold the device to the
face of MCDONALD for the purpose of attempting to unlock the device via facial
recognition in order to search the contents as authorized by these warrants.

20. This warrant authorizes a review of electronic storage media and electronically
stored information seized or copied pursuant to this warrant in order to locate

4

evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

21. With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.

## ATTACHMENT B-2
### Particular Things to be Seized

Evidence and remnants of MICHAEL LEE MCDONALD's use of Oxycodone Hydrochloride, Morphine Sulfate or any other controlled substances and any evidence relating to a violation of 18 U.S.C. § 922(g)(3), 21 U.S.C. § 844, 26 U.S.C. § 7201 or 26 U.S.C. § 7203. This warrant further authorizes law enforcement to draw and test the blood of MICHEL LEE MCDONALD (**TARGET LOCATION #2**), including the use of drug screen, for the purpose of determining the levels of Oxycodone Hydrochloride, Morphine Sulfate and any other controlled substances in his system.

**ATTACHMENT B-3**
**Particular Things to be Seized**

All items and records, in whatever form they exist, that constitute evidence, fruits, contraband and instrumentalities of violation of 18 U.S.C. § 922(g)(3) (Prohibited Possessor of Firearm), 21 U.S.C. § 844 (Possession of Controlled Substance), 26 U.S.C. § 7201 (Tax Evasion) and 26 U.S.C. § 7203 (Failure to File Tax Return) (collectively "TARGET OFFENSES"), including but not limited to:

1. Financial records indicating financial gain as a result of tax evasion;

2. Caches of United States currency;

3. Communications and documents to any individual or group regarding conspiracy or collusion to evade taxes or failure to file tax returns;

4. Communications, receipts or other documents corresponding to educational materials relating to taxes or the United States tax system;

5. Forms filed, both digital and hard-copy, to include but not be limited to Forms 1099-MISC, 1099-A, 1099-B, 1099-C, 1099-DIV, 1099-INT and 1099-K, including any amended or pending Forms, or records indicating the filing status of each for;

6. Firearms, firearm equipment and ammunition of any kind;

7. Records related to firearms, ammunition, weapons or Federal income taxes;

8. Controlled substances; both prescription and illicit;

9. Indicia of substance abuse, to include paraphernalia and apparatuses by which to abuse illegal controlled substances;

10. Appointment books, diaries, calendars, work schedules phone numbers, email addresses and real property addresses;

11. Indicia of occupancy, rental and/or use of the premises described herein including but not limited to; utility bills, rental agreements and keys;

12. Any and all photographs, including still photos, negatives, video recordings, films, undeveloped film and the content therein;

13. Computers, computer hardware, software, related documentation, passwords, data security devices (as described below), videotapes and or video recording devices, and

1

data that may constitute instrumentalities of, or contain evidence related to the TARGET OFFENSES. The following definitions apply to the terms as set out in this affidavit and attachment:

a. Computer hardware: Computer hardware consists of all equipment, which can receive, capture, collect, analyze, create, display, convert, store, conceal or transmit electronic, magnetic of similar computer impulses or data. Hardware includes any data-processing devices (including but not limited to cellular telephones, central processing units, laptops, tablets, e-Readers, notes, iPads, and iPods; internal and peripheral storage devices such as external hard drives, thumb drives, SD cards, flash drives, USB storage devices, CDs and DVDs, and other memory storage devices); peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, and related communications devices such as cables and connections), as well as any devices mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

e. Computer software is digital information, which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

f. Documentation: Computer-related documentation consists of written, recorded, printed, or electronically stored material, which explains or illustrates how to configure or use computer hardware, software, or other related items.

g. Passwords and Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touches. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it. As used above, the terms "records, documents, messages, correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials, created, modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

14. For any computer, computer hard drive, or other physical object upon which

2

computer data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

i.   evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

j.   evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

k.   evidence of the lack of such malicious software;

l.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

m.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

n.   evidence of the times the COMPUTER was used;

o.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

p.   documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER; contextual information necessary to understand the evidence described in this attachment.

15. With respect to the search of any of the items described above which are stored in

e.   the form of magnetic or electronic coding on computer media or on media capable of being read

f.   by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives,

g.   flash drives, hard disk drives, or removable digital storage media, software or memory in any form),

h.   the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of

3

items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

  i.   surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

  ii.  "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

  iii. "scanning" storage areas to discover and possible recover recently deleted files;

  iv.  "scanning" storage areas for deliberately hidden files;

  v.   or performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

16. If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

17. With respect to the electronic devices and COMPUTER equipment, law enforcement seize all data and information on the devices and equipment but is authorized to look for evidence, fruits, contraband, and instrumentalities regarding the TARGET OFFENSES only from January 1, 2016, through the present.

18. If it is determined that one or more of the electronic devices can be enabled with "Touch ID," law enforcement officers will be authorized to press the fingers (including thumbs) of MCDONALD to the Touch ID sensor of the electronic device, for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by these warrants. Law enforcement will not use force to effect this biometric authorization, and will instead explain the warrant's requirement to the individual in order to gain compliance.

19. If determined that one or more of the electronic devices can be enabled with facial recognition, law enforcement officers will be authorized to hold the device to the face of MCDONALD for the purpose of attempting to unlock the device via facial recognition in order to search the contents as authorized by these warrants.

20. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence,

fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

21. With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.

**ATTACHMENT B-4**
**Particular Things to be Seized**

All items and records, in whatever form they exist, that constitute evidence, fruits, contraband and instrumentalities of violation of 18 U.S.C. § 922(g)(3) (Prohibited Possessor of Firearm), 21 U.S.C. § 844 (Possession of Controlled Substance), 26 U.S.C. § 7201 (Tax Evasion) and 26 U.S.C. § 7203 (Failure to File Tax Return) (collectively "TARGET OFFENSES"), including but not limited to:

1.  Financial records indicating financial gain as a result of tax evasion;

2.  Caches of United States currency;

3.  Communications and documents to any individual or group regarding conspiracy or collusion to evade taxes or failure to file tax returns;

4.  Communications, receipts or other documents corresponding to educational materials relating to taxes or the United States tax system;

5.  Forms filed, both digital and hard-copy, to include but not be limited to Forms 1099-MISC, 1099-A, 1099-B, 1099-C, 1099-DIV, 1099-INT and 1099-K, including any amended or pending Forms, or records indicating the filing status of each form;

6.  Firearms, firearm equipment and ammunition of any kind;

7.  Records related to firearms, ammunition, weapons or Federal income taxes;

8.  Controlled substances; both prescription and illicit;

9.  Indicia of substance abuse, to include paraphernalia and apparatuses by which to abuse illegal controlled substances;

10. Appointment books, diaries, calendars, work schedules phone numbers, email addresses and real property addresses;

11. Indicia of occupancy, rental and/or use of the premises described herein including but not limited to; utility bills, rental agreements and keys;

12. Any and all photographs, including still photos, negatives, video recordings, films, undeveloped film and the content therein;

13. Computers, computer hardware, software, related documentation, passwords, data security devices (as described below), videotapes and or video recording devices, and data that may constitute instrumentalities of, or contain evidence related to the

1

TARGET OFFENSES. The following definitions apply to the terms as set out in this affidavit and attachment:

a. Computer hardware: Computer hardware consists of all equipment, which can receive, capture, collect, analyze, create, display, convert, store, conceal or transmit electronic, magnetic of similar computer impulses or data. Hardware includes any data-processing devices (including but not limited to cellular telephones, central processing units, laptops, tablets, e-Readers, notes, iPads, and iPods; internal and peripheral storage devices such as external hard drives, thumb drives, SD cards, flash drives, USB storage devices, CDs and DVDs, and other memory storage devices); peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, and related communications devices such as cables and connections), as well as any devices mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

h. Computer software is digital information, which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

i. Documentation: Computer-related documentation consists of written, recorded, printed, or electronically stored material, which explains or illustrates how to configure or use computer hardware, software, or other related items.

j. Passwords and Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touches. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it. As used above, the terms "records, documents, messages, correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials, created, modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

14. For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, "COMPUTER") that is called for by this

2

warrant, or that might contain things otherwise called for by this warrant:

q. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

r. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

s. evidence of the lack of such malicious software;

t. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

u. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

v. evidence of the times the COMPUTER was used;

w. passwords, encryption keys, and other access devices that Person #2 be necessary
to access the COMPUTER;

x. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER; contextual information necessary to understand the evidence described in this attachment.

15. With respect to the search of any of the items described above which are stored in
   i. the form of magnetic or electronic coding on computer media or on media capable of being read

j. by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives,

k. flash drives, hard disk drives, or removable digital storage media, software or memory in any form),

l. the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government

3

examination of all the data necessary to determine whether that data falls within the items to be seized):

i. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

ii. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

iii. "scanning" storage areas to discover and possible recover recently deleted files;

iv. "scanning" storage areas for deliberately hidden files;

v. or performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

16. If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

17. With respect to the electronic devices and COMPUTER equipment, law enforcement seize all data and information on the devices and equipment but is authorized to look for evidence, fruits, contraband, and instrumentalities regarding the TARGET OFFENSES only from January 1, 2016, through the present.

18. If it is determined that one or more of the electronic devices can be enabled with "Touch ID," law enforcement officers will be authorized to press the fingers (including thumbs) of MCDONALD to the Touch ID sensor of the electronic device, for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by these warrants. Law enforcement will not use force to effect this biometric authorization, and will instead explain the warrant's requirement to the individual in order to gain compliance.

19. If determined that one or more of the electronic devices can be enabled with facial recognition, law enforcement officers will be authorized to hold the device to the face of MCDONALD for the purpose of attempting to unlock the device via facial recognition in order to search the contents as authorized by these warrants.

20. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic

4

data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

21. With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will    locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.